UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CARGILL FERROUS INTERNATIONAL,                CIVIL ACTION
A DIVISION OF CARGILL INTERNATIONAL

VERSUS                                         NO. 03-0529
                                               c/w 03-3123

M/V MEDI TRADER, her engines,                  SECTION "C"
Tackle, apparel, etc., in rem

Opinion[1]

This matter was tried before the Court without a jury from July 24, 2006 until

August 1, 2006.  Having considered the testimony and evidence adduced at trial, the post

trial memoranda, the record and the law, the Court now issues this Opinion.  The parties

are Western Bulk Carriers A/S ("Western Bulk"), Seafarers Shipping, Inc. ("Seafarers"),

Victoria Ship Management, Inc. ("Victoria"), Cargill Ferrous International, Inc.

("Cargill"), TradeArbed, Inc. ("TradeArbed"), Freemak Industries, Inc. ("Freemak"),

ARCELOR Trading U.S.A., Inc. ("Arcelor").  The final three parties, plaintiffs in the

case consolidated with this proceeding, are sometimes collectively referred to as Arcelor.

I.  Preliminary Matters for the Consolidated Claims of Cargill and Arcelor

A.  Ruling on Objections to Admissibility of Chief Mate Bravo's Testimony

The objection of defendant Western Bulk to the admissibility of the testimony of

Chief Mate Joselito C. Bravo is **PARTIALLY GRANTED** and **PARTIALLY**

**DENIED**.  It is granted insofar as Bravo's testimony relates to whether Captain

---

[1] T. Haller Jackson, IV, a second-year law student at Tulane Law School, assisted with the research and preparation of this opinion.

1

Gregoryev was the supercargo in control of the stowage plans and denied as to all other matters, including what Bravo himself observed about the cargo and the conditions at loading. The reasoning is as follows. Western Bulk initially objected to Bravo's deposition of February 20, 2003, on the legitimate basis that Western Bulk was not represented at the deposition. Rec. Doc. 85 at ¶45 and 46. Western Bulk was however represented at Bravo's second deposition on October 31, 2004 where both the supercargo and the condition of the cargo were discussed. Jt. Tr. Ex. 89. About a week prior to trial, the Court granted Western Bulk's motion to bifurcate "the cargo quantum claims from the issues of liability between WBC and Seafarers." Rec. Doc. 78. At the opening of the trial, the Court questioned whether the trial exhibits, through Exhibit 89, were being admitted without objection. No counsel objected, including counsel for Western Bulk. Tr. Trans. at Rec. Doc. 90, p. 6. Bravo's first deposition was Exhibit 88. The Court then asked several questions including whether Captain Gregoryev was an employee of Seafarers. Id at 7. What followed was a discussion about Gregoryev's role as an employee of Western Bulk and as the author of the stowage plan. Id at 8-9. A short while later, counsel for Western Bulk objected to identifying Gregoryev's role, on the basis of the bifurcation: "As a supercargo the testimony - we have not brought in any testimony because the matter has been bifurcated as to damages to cargo and responsibility, vis a vis, the vessel owners." Id at 10. She finished by stating she didn't believe the testimony (necessarily Bravo's) about what Gregoryev said was relevant to the issues of the current trial. Significantly, no counsel for any of the other parties objected to this representation. From this sequence of events, the Court concludes that Western Bulk, by not objecting to the admission of the exhibits which included both Bravo depositions, waived its prior

objection, but that Western Bulk did preserve its objection to Bravo's testimony regarding what he said about Captain Gregoryev's role.  That objection is sustained by virtue of the previous bifurcation of issues, Western Bulk's understandable reliance upon it in not presenting contrary evidence and the lack of any objection from other counsel when Western Bulk's counsel reiterated her belief that Bravo's testimony in that regard was inadmissible at this trial, due to the bifurcation.  Unfortunately, while excluding Bravo's testimony regarding Captain Gregoryev preserves the bifurcated issue of responsibility as between Western Bulk and Seafarers for later development and resolution,  it also prevents the Court from deciding, at this juncture, Western Bulk's liability for negligence, if any, towards Cargill as well as Seafarers liability for negligence, if any, towards Freemak or Arcelor.

## II.  Cargill Claims

### A.  Preliminary Matters

While it is not contested, the Court must satisfy itself that it has jurisdiction over Cargill's claims.  Claims related to damage to cargo carried for hire internationally through navigable waters arise out of "traditional maritime activit[ies]."  Sisson v. Ruby, 497 U.S. 358 (1990).  Further, proceedings brought in rem against a vessel are distinctively admiralty proceedings within the meaning of 28 U.S.C. § 1333.  See American Dredging Co. v. Miller, 510 U.S. 443 (1994).  The letter of undertaking issued in lieu of arrest of the M/V MEDI TRADER suffices to establish in rem jurisdiction over

the vessel.  See Jt. Tr. Ex. 91[2].  Consequently, Cargill's claims are within the admiralty

and maritime jurisdiction of this Court for the purposes of both 28 U.S.C. § 1333 and

Federal Rule of Civil Procedure 9(h).  The objection to the relevance of Exhibit 90 is

**DENIED** as it provides information about the types and condition of the cargo aboard the

ship.


B.  Findings of Fact and Conclusions of Law

a.  Background

   Cargill is a corporation in the business of trading steel products internationally.

From July, 2002 through September, 2002, Cargill executed six contracts for the

purchase of prime newly produced hot dipped galvanized steel coils from Tezcan

Galvanizli Yapi Elemanlari ("Tezcan") for shipment to customers in the United States.

See Jt. Tr. Ex. 31, 34, 36, 39, 41.  Each contract was on a cost and freight basis, meaning

that Cargill paid Tezcan for both the manufacture and shipment of the coils to one of two

ports, depending on the specifications of the contract, in New Orleans, LA or Houston,

TX.  Id. Each contract demanded a full set of clean on board ocean bills of lading.  Id.

All bills of lading relating to these claims identified the shipper as Tezcan, the carrier as

Seafarers, the vessel as the M/V MEDI TRADER, and the consignee as Cargill.  Id.

   Seafarers, the owner and claimant of the M/V MEDI TRADER, entered into a

time charter with Nisshin Shipping Co., Ltd. on July 16, 1999.  Rec. Doc. 16; Rec. Doc.

---

2. Defendants' objection to the relevance of this exhibit is **DENIED**.  The letter of undertaking is relevant to jurisdiction
as it demonstrates consent to the *in rem* action in lieu of the vessel arrest.  See Fed. R. Ev. 401;  Steel Corp. v. Barge Sea
Span, 769 F.2d 620 (9th Cir. 1985).

58, p. 16 ¶7d, Jt. Tr. Ex. 1[3].  Nisshin in turn entered into a time charter with Van

Ommeren Clipper Bulk Shipping on May 14, 2002. Jt. Tr. Ex. 2.  Van Ommeren in turn

entered into time charter with Western Bulk on December 5, 2002.  Jt. Tr. Ex. 3.  All of

the time charters authorized the charter or agents to issue and sign bills of lading on

behalf of Seafarers.  Jt. Tr. Ex. 1, 2, 3 cl. 62.  In conformity with the time charter,

Western Bulk's agent signed the bills of lading under which Cargill's cargo was carried,

and did so as an agent for Seafarers.  Jt. Tr. Ex. 31, 34, 36, 39, 41; Jt. Tr. Ex. 3 cl. 62.

   1. *Contract 11499.1 / Bills of Lading 38895*

On July 24, 2002, Cargill executed contract number 11499.1 with Tezcan to

purchase 270 metric tons of hot dipped galvanized steel coils on a cost and freight basis

to be shipped aboard the M/V MEDI TRADER to Houston, TX., for its customer

Reliance Steel & Aluminum Co. in Arlington, TX., providing for duty paid delivery to

the Houston dock. Jt. Tr. Ex. 36, p.13.  All identified uses were for HVAC (heating

ventilation air conditioning) "unexposed."  Id at 14-15.  Ocean bill of lading number

WBC38895 was issued on December 31, 2002 in Turkey that identified this contract,

listed the shipment as 280.1 metric tons of hot dipped galvanized steel, showed freight

prepaid, with delivery to Houston, TX, and identified the coils as "clean 'on board'" with

the notation "some strips broken/loose, packing material have slight indents." Id at 2.

   2. *Contract 11499.3 / Bills of Lading 38897*

On August 12, 2002, Cargill executed contract number 11499.3 with Tezcan to

purchase 1,7000 metric tons of hot dipped galvanized steel coils to be shipped aboard the

---

3. Western Bulk objected to this document in a pretrial motion in limine, Rec. Doc. 73, which the Court found moot by virtue of the bifurcation of issues.  Rec. Doc. 78.  The document is relevant and nonprejudical however insofar as it tracks the history of the M/V MEDI TRADER charters.

5

M/V MEDI TRADER to New Orleans, LA, and eventually to its customer New Process Steel, LLP in Aslip, IL. Jt Tr. Ex. 34, p. 24. The identified end-uses for items #4, 5, 6, 8, and 10, comprising 600 MTs, were as unexposed heating, ventilation, and air condition materials. Id. at 25 The identified end-uses for items 11, 12, 13, 14, and 15, comprising the remaining 11000 MTs of the order, were various exposed constructions, such as exposed columns and rafters, mini storage door track, refrigeration door panels, and others. Id. at 26-27. Ocean bill of lading number WBC38897 was issued on December 31, 2002 in Turkey, which identified this contract, listed the shipment as 1,814.145 metric tons of hot dipped galvanized steel, showed freight prepaid, with delivery to Houston, TX, and identified the coils as "clean 'on board'" with the notation "some strips broken/loose, packing material have slight indents." Id. at 6.

   3. *Contract 11499.6 / Bills of Lading 38900*

   Also on August 19, 2002, Cargill executed contract number 11499.6 with Tezcan to purchase 210 metric tons of hot dipped galvanized steel coils on a cost and freight basis to be shipped aboard the M/V MEDI TRADER to Houston, TX. and then delivered to its customer Baldwin Steel Co. in Tulsa, OK. Jt. Tr. Ex. 31, p. 26, 28. The identified end use was as general cut-to-length and slitting materials, without specification as to exposure. Id.at 27. Ocean bill of lading number WBC38900 was issued on December 31, 2002 in Turkey that identified this contract, listed the shipment as 219.710 metric tons of hot dipped galvanized steel, showed freight prepaid, with delivery to Houston, TX, and identified the coils as "clean 'on board'" with the notation "some strips broken/loose, packing material have slight indents." Id. at 18.

6

4. *Contract 11499.2 / Bills of Lading 38896*

Again, on August 19, 2002, Cargill executed a contract, number 11499.2, with Tezcan for 1,270 metric tons of hot dipped galvanized steel coils to be shipped aboard the M/V MEDI TRADER to New Orleans, LA. and delivered to its customer Baldwin Steel Co. in Memphis, TN. Jt. Tr. Ex. 41, p. 13, 19. The identified end-uses for the coils were as heating, ventilation, and air conditioning materials, without specification as to the exposure. Id. at 20-23. Ocean bill of lading number 38896 was issued on December 31, 2002 in Turkey that identified this contract, listed the shipment as 1,337.825 metric tons of hot dipped galvanized steel, showed freight prepaid, with delivery to Houston, TX, and identified the coils as "clean 'on board'" with the notation "some strips broken/loose, packing material have slight indents." Id. at 2.

5. *Contract 11499.5 / Bills of Lading 38899*

On August 19, 2002, Cargill executed contract number 11499.5 with Tezcan to purchase 1,270 metric tons of hot dipped galvanized steel coils to be shipped aboard the M/V MEDI TRADER to New Orleans, LA and then delivered to its customer Baldwin Steel Co. in Tulsa, OK. Jt. Tr. Ex. 39, p. 19, 24. The identified end use was as vent pipe without specification as to exposure Id. at 20-23. Ocean bill of lading number WBC38899 was issued on December 31, 2002 in Turkey that identified this contract, listed the shipment as 1,336.665 metric tons of hot dipped galvanized steel, showed freight prepaid, with delivery to Houston, TX, and identified the coils as "clean 'on board'" with the notation "some strips broken/loose, packing material have slight indents." Id. at 2.

7

6. *Contract 11499.4 / Bills of Lading 38898*

Finally, also on August 19, 2002, Cargill executed contract number 11499.4 with Tezcan to purchase 1,150 metric tons of hot dipped galvanized steel coils with end-use as vent pipe/HVAC without specification of the exposure of the steel. Jt. Tr. Ex. 31, p. 14. These coils were shipped to Cargill's customer Baldwin Steel Co. in Houston, TX. aboard the M/V MEDI TRADER. Id. at 17.  Ocean bill of lading number WBC38898 was issued on December 31, 2002 in Turkey that identified this contract, listed the shipment as 1,217.275 metric tons of hot dipped galvanized steel, showed freight prepaid, with delivery to Houston, TX, and identified the coils as "clean 'on board'" with the notation "some strips broken/loose, packing material have slight indents." Id.

b.  Procedural History

Cargill commenced this action against the M/V MEDI TRADER in rem. on February 19, 2003.  Complaint, Rec. Doc. 1.  However, because its claims against the vessel were admiralty and maritime claims within the meaning of Fed. R. Civ. Pro. 9(h), any claims made by the claimant of the vessel, Seafarers, against third-parties makes such third-party defendants liable not only to the third-party plaintiff Seafarers, but to Cargill on the claims of the third-party plaintiff.  See Fed. R. Civ. Pro. 14(c).  Here, Seafarers and Victoria instituted a confusing third-party action against Western Bulk. Rec. Doc. 36.  The caption of the pleading referenced Cargill but in the body of the demand, it cited only the factual allegations of the claims against it by TradeArbed, Freemak and Arcelor, not Cargill.  Id. at 2-3, ¶sIII, IV and V.  However, in the prayer for relief, it asked for dismissal of Cargill's claims, not that of the other cargo claimants.  Id.

8

at 4[4]. Western Bulk never answered the third party action but did eventually file a

Motion to Stay Pending Arbitration of that action as well as a cross-claim by Seafarers

against it. Rec. Doc. 54.   In the supporting memorandum, Western Bulk described the

third party action as a "claim against Western Bulk in the Cargill case."   Rec. Doc. 54-2

at 5.  Since Western Bulk has treated the third party claim against it as involving Cargill,

no prejudice has occurred due to the confusion in the body of the claim.  Consequently,

Cargill may take advantage of Fed. R. Civ. Pro. 14(c)  and likewise has a claim against

Western Bulk.  However, unlike the claims of the consolidated plaintiffs Tradearbed,

Inc., Freemak Industries, Inc., ARCELOR Trading U.S.A., Inc. (together "Arcelor"),

Cargill brought no action against Victoria and neither Seafarers nor Western Bulk

brought a third-party action against Victoria; consequently, the liberal impleader

provisions of the Federal Rules of Civil Procedure are inoperable and Victoria has no

liability as to Cargill.  As Seafarers appeared solely as the claimant of the vessel, and

there has been no third-party practice against it by a cross-plaintiff, it has no in personam

liability to Cargill.  See Rec. Doc. 16.

c. Theories of Liability

1. *Carriage of Goods by Sea Act*

Cargill claims that the M/V MEDI TRADER  is liable to it under the Carriage of

Goods by Sea Act, 24 U.S.C. § 1300 et seq. ("COGSA").  Rec Doc. 1.  COGSA provides

> a complex burden-shifting procedure.  Initially, the plaintiff must establish a
> prima facie case by demonstrating that the cargo was loaded in an undamaged
> condition and discharged in a damaged condition.  For the purpose of determining
> the condition of the goods at the time of receipt by the carrier, the bill of lading

---

4. The cause of the confusion appears to be careless drafting of the pleading, lifting the third party complaint from the
cross-claim filed earlier.  Rec.Doc. 35.

> serves as prima facie evidence that the goods were loaded in the condition therein described.  If the plaintiff presents a prima facie case, the burden shifts to the defendants to prove that they exercised due diligence to prevent the damage or that the damage was cased by one of the exceptions set forth in § 1304(2) of COGSA, including perils, dangers, and accidents of the sea or other navigable waters . . . If the defendants show that the loss was cased by one of these exceptions, the burden returns to the shipper to establish that the defendants' negligence contributed to the damage.  Finally, if the shipper is able to establish that the defendants' negligence was a contributory cause of the damage, the burden switches back to the defendants' to segregate the portion of the damage due to the excepted cause from that portion resulting from the carrier's own negligence.

Steel Coils, Inc. v M/V Lake Marion, 331 F.3d 422, 426 (5th Cir. 2003); see also U.S. v.

Lykes Bros. S.S. Co., 511 F.2d 218, 223 (5th Cir. 1975).  Since, as discussed infra,

Seafarers and the M/V MEDI TRADER are COGSA carriers, the negligence claims

against the ship are displaced.  See St. Paul Fire & Marine Ins. Co. v. Marine

Transportation Srv's Sea-Barge Group, Inc., 727 F. Supp. 1438, 1439 (S.D. Fla. 1989).

2. *General Maritime Negligence*

Seafarers, as the claimant of the vessel, brought a third-party action against Western

Bulk under, inter alia, a theory of negligence that now operates as a claim by Cargill

against Western Bulk.  *Third-Party Complaint, Rec. Doc. 36.*  COGSA is not an

exclusive remedy for damage to cargo.  A non-carrier, such as Western Bulk, may be

liable to a shipper for damage to cargo based on a tort theory of negligence.  See  Steel

Coils, 331 F.3d at 438-39; see also Herd & Co. v. Krawkill Machinery Corp., 359 U.S.

297 (1959).  To establish a claim for negligence, the plaintiff must prove that "there was

a duty owed by the defendant to plaintiff, breach of that duty, injury sustained by [the]

plaintiff, and a causal connection between the defendant's conduct and the plaintiff's

injury." Canal Barge Company, Inc. v. Torco Oil Company, 220 F.3d 370 376 (5th

Cir.2000).  The existence and scope of a duty turns primarily on "the foreseeability of the

10

harm suffered by the complaining party." Consolidated Aluminum Corporation v. C.P. Bean Corporation, 833 F.2d 65, 67 (5th Cir.1987).

### d. Claims Against the M/V MEDI TRADER

Seafarers is a carrier within the meaning of COGSA because it was the owner into which a contract of carriage covered by a bill of lading was entered with the consignee Cargill for each of the claims. See Steel Coils, 331 F.3d at 437-38; 46 U.S.C. § 1301. The fact that Cargill was the consignee, rather than the shipper does not operate to defeat this carrier relationship. See Leather's Best Intern., Inc. v. M/V Lloyd Sergipe, 760 F. Supp. 301 (S.D.N.Y. 1991). Further, COGSA is the law which governs these claims ex proprio vigore because the bills of lading which are evidence of a contract of carriage are for the shipment of goods from a foreign port to the United States. See Jt. Tr. Ex. 1-3; 46 U.S.C. § 1300. Therefore, Cargill must prove that the cargo it claims was damaged was loaded in an undamaged condition and discharged in a damaged condition to establish its prima facie case. See Steel Coils, 331 F.3d at 426.

A clean bill of lading is prima facie evidence of cargo loaded in an undamaged condition. See Steel Coils, 331 F.3d at 426; Tubacex v. M/V RISAN, 45 F.3d 951, 954 (5th Cir. 1995); Blasser Bros., Inc. v. Northern Pan-American Line, 628 F.2d 376 (5th Cir. 1980); 46 U.S.C. § 1303(4). The bills of lading to Cargill were issued "clean on board" with the notation "some strips broken/loose, packing material have [sic] slight indents." Jt. Tr. Ex. 31, 34, 36, 39, 41. There is a conflict between the two phrases, one indicating that the cargo was clean on board, the other noting some defects. One purpose of COGSA is to permit a consignee to rely on the description of the goods in bills of lading, as is evidenced by the ordinary requirement of shipping contracts that the bills of

11

lading be clean.  See Spanish-American Skin Co. v. M/S/ Ferngulf, 143 F. Supp. 345 (S.D.N.Y. 1956).  Consequently, in construing this inconsistent language, the Court finds that the bills of lading were issued clean because the relevant contracts called for issuance of clean on board bills of lading, and that phrasing was used.  To permit apparently canned language to defeat the cleanliness of these bills would be to undermine the reasonable reliance that shippers and consignees put on a "clean on board" notation. This conclusion is buttressed by the fact that the notations on the bills of lading do not bear on the type of damage claimed by Cargill.

However, Seafarers claims that the bills of lading were issued clean on board in contravention of the clauses of its charter parties which requires that bills of lading be issued in conformity with the Mate's Receipts.  That is, "Where however a charterer or an appropriate agent signs a bill of lading without the authority of the master or by signing not in accordance with the master's instructions, exceeds the authority granted by the master, 'the owner does not become a party to the contract of carriage and does not become liable as a carrier within the meaning of COGSA.'"  Cargill v. M/V Sukarawan Naree, 1997 WL 537992 (E.D. La. 1997) (quoting Thyssen Steel Co. v. M/V Kavo Yerakas, 50 F.3d 1349, 1351 (5th Cir. 1995)).  The evidence fatal to this claim is that the bills of lading were issued in essential conformity with the Mate's Receipts.  See Jt. Tr. Ex. 20 (noting some damage to the packing materials in the Mate's Receipts, only the "quality/contents unknown" and "shippers weight" notations were not included).  Further, had they not been, what is crucial to the determination of Cargill's claim is that it received bills of lading which were "clean on board," and so it has carried the burden of proving that the coils themselves were loaded in an undamaged condition.  While there

is an intimation that perhaps the Mate's Receipts should have contained other clausing, such is a potential dispute between Western Bulk and Seafarers that is not before the Court in this part of the bifurcated proceedings.

Seafarers also claims that since the materials were packaged, that the bills of lading do not establish a prima facie case of undamaged condition of the goods at loading. It is true that Caemint Food Inc. v. Lloyd Compahnia de Navegacao, 647 F.2d 347 (2nd Cir. 1981) states as much. However, the Fifth Circuit has distinguished that case in Steel Coils, 331 F.3d at 429, holding it does not apply when the packaging of steel coils evinces no damage prior to loading. Further, the Court, having inspected the photographs and report of the pre-load surveyors Metropole Maritime and Trading, hired by the vessel interests themselves, finds that the coils were loaded in good order with perhaps some minor damage to the packaging which does not form the basis for this claim. Jt. Tr. Ex. 20. The Fora Mar Shipping and Consulting report further supports this conclusion. Jt. Tr. Ex. 21. The coils were certainly loaded without the tide-line, drip down, and obvious rust present at unloading.

Accordingly, Cargill has carried its burden of proof that the coils at issue were loaded in good condition.

Now, Cargill must prove that the cargo was unloaded in a damaged condition if it is to make out a prima facie case of liability of the vessel. The evidence of damage to the cargo is overwhelming.

1. *Bills of Lading 38895 / Contract 11499.1 / Claim 6323-3*

The 30 coils loaded in good order into cargo hold 3 of the M/V MEDI TRADER were found, along with the other consignments, during discharge in Houston, Texas on

13

February 13, 2003 by Cargill's surveyor, Capt. I.S. Derrick, to have "corrosion in the inner diameters . . . with corrosion streaking patterns in the [inner diameters] and/or coil faces . . . [along with] water . . . noted on the tank top and tide lines on bottom tiered coils . . . [along with] moisture buildup (corrosion) . . . apparent in areas of coil to coil contact . . . [and] [h]eavily corroded drip down patterns were noted on some top tiered coils" in various locations underneath hatch coaming.  Jt. Tr. Ex. 28, p. 6.  Lower tiered coils were found to be out of round because of improper stowage, namely, stacking the coils 4 high in some places.  Id at 5.  On examination at Reliance Steel & Aluminum Co in Arlington, Texas on May 9, 2003, coil number 21.18054 of bill of lading number 38895 was found to be corroded beyond use or sale by both the cargo and vessel's charter's interests.  See Jt. Tr. Ex. 37, p. 5; 46.  After calculating the retention value of the corroded coil, the damage Cargill suffered was $3,763.78.  Jt.Tr. Ex. 37 at 7.  Mill numbers 21.18045, 21.18052, 21.17162, 21.18900, 21.17878 also were similarly damaged, resulting in a loss of $7,992.54.  Jt. Tr. Ex. 38, p. 3.  However, mill number 21.17162 suffered from manufacturing defects.  Id. at 4.  Cargill paid a survey fee of $2,059.40 for the first survey and $1,764.36 for the second.  Jt. Tr. Ex. 37 at 18; 38 at 10.  It was the opinion of the cargo interests' surveyor that the damage was caused by a combination of heavy ship sweat, cargo sweat, and possible seawater exposure that was attributable to a lack of proper ventilation and faulty stowage.  Jt. Tr. Ex. 37, p. 6.  The vessel interests' surveyor attributed the damage on a gross examination of all the cargo on February 13, 2003 (no particularized conclusion for coil number 21.18054 was given) to cargo sweat and mill defects.  Jt. Tr. Ex. 43, pg. 12.  The Court credits the conclusions of the cargo interests' surveyor after reviewing the photographic evidence and determines

14

the cause was for improper ventilation and stowage, but reduces the damage proportionately for the mill defect in number 21.17162. The damages for this claim are $15,000.00.

### 2. Bills of Lading 38896 / Contract 11499.2 / Claim 6323-5

The 145 coils loaded in good order into cargo holds 1, 3, and 5 of the M/V MEDI TRADER were found, along with the other consignments, during discharge in New Orleans, Louisiana, on February 17, 2003 by Cargill's surveyor, Capt. I.S. Derrick to be in various states of damage. Jt. Tr. Ex. 30 pgs. 4-6. Cargo hold 3 was found to have "many puddles and wet areas", Id at 4, and salt contamination was found in hold 1 Id. On closer examination of the coils at Fullen Dock in Memphis, Tennessee and Baldwin Steel Company, also in Memphis, on May 14, 2003, the cargo interests' surveyor found that there were heavy amounts of rust and corrosion, with streaking patterns on inner and outer surfaces, tide lines and an out of round shape. Jt. Tr. Ex. 42, pg 5-6. The survey also noted 25 out of round coils, three with tide-lines. Id.at 6-7.  An additional survey of 15 randomly selected, representative coils revealed corrosion varying from none to almost all of a coil, along with tide-lines and deformation of shape. Id. at 7.  The surveyor concluded that the corrosion was attributable to salt-laden sweat and the out of round conditions were attributable to "rough, careless, and/or improper handling during loading operations, as well as, improper stowage aboard the ocean carrier." Id. at 9. This survey noted that the retention value accepted was $15.00 per hundred pounds, after rejecting an offer $13.50, instead of the $22.00 contract price. This resulted in damages of $309,335.71, along with a survey fee of $5,332.67 and costs to decan the coils of $375.00. Id. at 10, 42.

The vessel interests' surveyor, Maritech Commercial, noted 21 out of round coils and detailed the runs of the 15 coils which also indicated substantial rust on the coils. Jt. Tr. Ex. 48 pg. 5. It noted that the "time charterer" should be responsible for the out of round coils. Id. at 7. The vessel charters' surveyor, Technical Maritime Associates, found 29 coils out of round, various coils with tide-lines, and damage on the 15 coils run to 28.7% of the material, somewhat higher than the qualitative average available from the cargo interests' surveyor. Jt Tr. Ex. 49 pg. 3-9. This survey noted that of the coils with tide-lines, this could be attributed to condensation and/or water/snow run-off from the steel slabs stored with this cargo in cargo hold 3. The remaining corrosion was attributable to a combination of water and snow run-off and condensation drip down. Id. at 10-11. The survey noted that it considered the retention value of $15.00 which resulted in a 32% reduction in value of the contract "slightly excessive," given the amount of white rust found. Id. at 10. However, the Court, considering the number of out of round coils as well, which the evidence shows ranged from 21 to 29 coils, finds the valuation reasonable. Further, the Court, given the conduct of the parties, all of whom had representatives available, is willing to apply this reduction in value across the entirety of the coil shipment as it was decidedly unfeasible to decan and examine each coil individually. The Court concludes that the corrosion was caused by contact with salt-laden ship sweat and the out of round coils from improper stowage.

Therefore, after inspection of the representative photographic evidence from the cargo and charterers' interests, the Court finds the damages for this claim are $309,335.71 for the coils, along with a survey fee of $5,332.67 and costs to decan the coils of $375.00 for a total of $315,042.93.

16

### 3.  *Bills of Lading 38897 / Contract 11499.3 / Claim 6323-2*

The 180 coils loaded in good order into cargo holds 1, 3, and 5 of the M/V MEDI

TRADER were found, along with the other consignments, during discharge in Houston,

Texas on February 17, 2003 by Cargill's surveyor, Capt. I.S. Derrick to be variously

damaged. Jt. Tr. Ex. 30 pgs. 4-6. Cargo hold 3 was found to have "many puddles and

wet areas", Id at 4, and salt contamination was found in hold 1. Id. On more detailed

examination at New Process Steel in Chicago, Illinois on May 22, 2003, by the cargo

interests, corrosion was found on the coils sampled. Jt. Tr. Ex. 35 pg. 4. After

processing 83.1% of the shipment, 9.4% of the material was found to be unusable, and a

retention offer of $9.50 per CWT was made. Id. at 5. Of the remaining 16.9%, a

retention offer was made which reduced the contract value by 2.45%. Id.. An auction

was conducted for the material that had been rejected by New Process, rather than

accepting the retention offer for the processed material, while the retention offer for the

unprocessed steel was accepted. Id. at 6. The auction resulted in $33,633 for salvage of

the material. Id. at 7. However, two of the coils were rejected for reasons other than

damage in transit. Id. at 8. This resulted in damages of $63,842.32 and a survey fee of

$8,340.24. Id. at 8, 31.

The reports of the vessel and charterer interests detail damage as well. The vessel

interests noted rejection of 10.2% of the coils, of which it said 60% was attributable to

rust, while 40% was attributable to mill defects. Jt. Tr. Ex. 44 pg. 4. A total of 72.3%

had been processed prior to inspection, with 10.3% rejected because of rust. Id. at 3. The

charterers' surveyor noted rejection of 42 of the 180 coils, with an average amount of

material rejected for rust from those coils of 31.2%. Jt. Tr. Ex. 45 pg. 15. Of the 42 coils

17

rejected, it concluded that 16 were rejected for reasons attributable to rust from
condensation of water and snow run-off in cargo hold 3, while 26 were damaged during
loading or at some other point. Id. at 16.

After considering the evidence presented from the various surveys, including
inspection of representative photographic evidence from the cargo and charterers'
interests, the Court determines that the damages should be $72,182.56, less $1,377.56
that is attributable to mill defects, as noted in the cargo interests' survey, for a total of
$70,805.00. This damage was caused by improper ventilation and stowage which
resulted in salt-laden ship sweat and cargo sweat. While it is true that the percentage
reduction in the value of the contract is greater than the apparent percentage of defect in
the coils, the auction produced a salvage value that represented a steeper decline in price
than value attributable to damage solely as a percentage. However, there is nothing in
the record to indicate the auction was held in anything but good faith, and it attracted 28
bidders. Therefore, the salvage value is considered reasonable.

4. *Bills of Lading 38898, 38900 / Contract 11499.4,6 / Claim 6323-1*

The 120 coils loaded in good order into cargo hold 3 under bill of lading 38898,
and the 16 considered in this report from bill of lading 38900, of the Medi Trader were
found, along with the other consignments, during discharge in Houston, Texas on
February 13, 2003 by Cargill's surveyor, Capt. I.S. Derrick, to have "corrosion in the
inner diameters . . . with corrosion streaking patterns in the [inner diameters] and/or coil
faces . . . [along with] water . . . noted on the tank top and tide lines on bottom tiered
coils . . . [along with] moisture buildup (corrosion) . . . apparent in areas of coil to coil
contact . . . [and] [h]eavily corroded drip down patterns were noted on some top tiered

coils" in various locations underneath hatch coaming. Jt. Tr. Ex. 28, p. 6. A further examination was conducted at Baldwin Steel in Houston, Texas, on February 17-18 and March 25-26, 2003. Jt. Tr. Ex. 33. It found, according to the cargo interests' survey, damage to a representative sample of 17 coils, of which 11 were run on the machines, ranging from 7.85% to 57.22% of each coil. Id. at 6-7. The results of the charters' interest survey are the same. Jt. Tr. Ex. 43, pgs. 3-11. Accordingly, the Court finds the retention price of $15.50 per CWT reasonable. After considering the photographic evidence, the Court determines that the damage is attributable to heavy ship and cargo sweat caused by improper ventilation and stowage. The damages for this claim are $305,006.19 in depreciation and $4,959.45 in survey expenses for a total of $309,965.64.

     5. *Bills of Lading 38899 and 38900 (portion) / Contract 11499.4 / Claim 6323-4*

     The 136 coils of bill of lading 38899 and 6 coils of 38900 loaded in good order into cargo holds 1, 3, and 5 of the M/V MEDI TRADER were found, along with the other consignments, during discharge in New Orleans, Louisiana on February 17, 2003 by Cargill's surveyor, Capt. I.S. Derrick to be variously damaged. Jt. Tr. Ex. 30 pgs. 4-6. Cargo hold 3 was found to have coils with tide line rust. Id. at 6. A subsequent damage survey was conducted at Baldwin Steel in Tulsa, Oklahoma on May 20, 2003. Jt. Tr. Ex. 40. Baldwin Steel worked through the entire lot by December 30, 2003, and rejected (in pounds) 3,000 of Baldwin coil number M00364A, 2,000 of M00364B, 7,520 of M00473A, 4,516 of M00474A, 2,700 of M00420A, 1,680 of M00450A, 5,400 of M00488A, 718 of M00488B, 1,856 of M00488C, 1,864 of M00488D, 940 of M00488E, 21,892 of (Mill coil number) 2118623, 23,611 of 2118624, 22,553 of 2118625, 22,906 of 2118626, 22,884 of 2118627, and 16,932 of 2118628. Id. at 4. This resulted in a loss of

19

$20,203.80 and survey costs of $2,496.55.  Id.. The information from the charterers'
interest surveyor was apparently not updated to reflect this final information.  Jt. Tr. Ex.
47.  After considering the photographic evidence and reports of the parties, the Court
finds that the damage was a result of improper ventilation and improper stowage.  Total
damages are $22,700.35.

Chief Mate Joselito Bravo's testimony supports the faulty conditions leading to
the damage.  Jt. Tr. Ex.88 and 89.  He observed the cargo being loaded at the various
ports.  Jt. Tr. Ex. 88 at 11.  He saw snow covered slabs being put in the same cargo with
moisture sensitive galvanized coils,  Id at 42-46, 59 and that the two cargoes were stowed
very close together,  Id at 53-54.  He pumped water out of one hold during the trip and
saw the tidemarks on the coils at discharge and assumed they were caused by the melting
snow.  Id at 155, 54-55.  At another port, he saw wet hot rolled coils loaded into the same
holds as the moisture sensitive cargo.  Id at 66-69.  He also testified to seeing the coils
stowed four tiers high instead of three.  Id at 92-97.

Having made this prima facie showing of liability, the burden now shifts to
Seafarers, as claimants of the M/V MEDI TRADER, to prove that it exercised due
diligence to avoid this damage, or that the damage was attributable to one of the
exceptions set forth in 46 U.S.C. §1304.  Seafarers maintains that the damage was a
result of a peril of the sea (inability to fully ventilate), an inherent vice of the goods, an
insufficiency of the packaging, and that it exercised due diligence.

Even though sweat is a recognized peril of the sea, in order to make out a defense
of perils of the sea, Seafarers must demonstrate that the sweat which damaged the cargo
was unforeseeable or inevitable.  See Wessels v. The Asturias, 126 F.2d 999 (2nd Cir.

1942); J. Gerber & Co v. S.S. Sabine-Howaldt, 437 F.2d 580 (2nd Cir. 1971).  However, despite the argument that the M/V MEDI TRADER encountered a difficult voyage which it claims made it impossible to ventilate the cargo holds, Seafarers failed to establish that such weather was unusual or unanticipated at that time of year.[5]  More importantly, the improper stowage of the coils, with snow and ice covered materials, the stowage of hot and cold rolled coils together, and the improper stacking, mean that the occurrence of sweat was neither unforeseeable nor unpredictable.  Further, even if Seafarers had demonstrated that the sweat which was the proximate cause of the corrosion damage was a peril of the sea, Cargill has carried its burden of proof to show that the improper stowage contributed to the damage, and Seafarers has not carried its burden of proof in segregating damages.

As to a claim of an inherent vice of the goods, only two coils were found to be so affected by mill defects that such an inherent vice was the cause of the damage to Cargill. Those coils have been excluded from the damage calculation.  As to the insufficiency of the packaging, which requires that the usual, normal, and customary packaging not have been used, Seafarers has not carried its burden to prove that the wrappers used were insufficient.  See Copco Steel & Engineering Co. v. The Prins Frederik Hendrik, 129 F. Supp. 469 (D. Mich. 1955).  As to the diligence of Seafarers, as noted above, the ventilation and stowage of the coils was improper and so it has not carried its burden of affirmatively proving diligence.

---

5. Chief Mate Bravo testified by deposition that the storm, while "very rough", was usual for a winter passage. Jr. Tr. Ex. 88, p. 151, 158.

Accordingly, the M/V MEDI TRADER is liable to Cargill for $733,514.10. However, this liability is subject to a $500.00 per package limitation so long as Cargill was given notice of the limitation and a fair opportunity to declare a higher value. See 46 U.S.C. § 1304(5); Brown & Root, Inc. v. M/V Peisander, 648 F.2d 415, 420 (5th Cir. 1981); Industrial Maritime Carriers (Bahamas), Inc. v. Siemens Westinghouse Power Corp., 2002 WL 1767421, at *2 (E.D. La. 2002). The 250 Ruble limitation in the bills of lading is preempted by the $500.00 limitation. However, that limitation, and the clause paramount, gave Cargill fair notice to declare a higher limitation. See Brown & Root, 648 F.2d at 424. Therefore, the $500.00 per package limitation applies. Cargill's contention that deviation of the ship suffices to defeat this limitation is barred as it was neither included in the Pre-Trial Order, nor "implicitly tried." See Rec. Doc. 58; Lindy Investments, L.P. v. Shakertown Corp., 1998 U.S. Dist. LEXIS 11671, at *5 (E.D. La. 1998). Further, there was no showing of an unreasonable deviation.

The Court finds, as a factual matter, that each coil was a package, relying in particular on notation on the bills of lading that indicates the number of items, in this case coils, that were shipped. Cf. Tamini v. Salem Dry Cargo AB, 866 F.2d 741, 743 (5th Cir. 1989). Therefore, Cargill can recover no more than $500.00 times the number of coils listed on each bill of lading.

The Court finds that Cargill's calculations accurately account for the damages. Rec. Doc. 99, p. 13-14.. Consequently, **IT IS ORDERED THAT** the M/V MEDI TRADER is liable in rem to Cargill for $264,452.67.

22

### e. Claims Against Western Bulk

Western Bulk was not a carrier within the meaning of COGSA as to Cargill. While Western Bulk may have been a charterer, the contracts of carriage, the bills of lading, were between the owner of the M/V MEDI TRADER, Seafarers, and Tezcan, with Cargill as the consignee. Therefore, since there is no contract of carriage between Cargill and Western Bulk, COGSA is inoperative. See 46 U.S.C. § 1300. However, Cargill can assert a claim against Western Bulk for negligence. Unfortunately, the primary basis for the claim against Western Bulk is the alleged active and overriding participation of its agent, Captain Gregoryev, in the stowage plans as supercargo. This evidence comes exclusively from the deposition testimony of Seafarer's chief mate, Joselito Bravo. Bravo Deposition, Jt. Tr. Ex. 88, pgs 14-17, 41-46, 94-97, 130; Ex. 89, pgs 15-16, 18, 23-24. While this evidence, if unrebutted, is highly probative of negligence, the Court has ruled that Western Bulk's objection to Bravo's testimony in this regard was preserved and well founded. The issue was, in effect, severed by virtue of the bifurcation, to be resolved at a later date.

### III.  TradeArbed, Inc., ARCELOR Trading U.S.A., Inc. d/b/a/ Freemak Industries, Inc. ("Arcelor") Claims

### A.  Preliminary Matters

The record reflects neither arrest of the M/V MEDI TRADER, nor a letter of undertaking issued in favor of Arcelor. Consequently, the claims against the M/V MEDI TRADER in rem are **DISMISSED FOR WANT OF JURISDICTION.** See Jt. Tr. Ex. 91 (noting the letter of undertaking was issued on behalf of Cargill only). However,

effective in personam jurisdiction was obtained over the defendants Seafarers, Victoria, and Western Bulk through service of process, consistent with the applicable long-arm statute and due process, and the subsequent appearance and defense of the action by the defendants.  See Fed. Rec. 2:03-cv-03123-HGB-ALC Doc. 2, 3, 4.


B.  Findings of Fact and Conclusions of Law

a.  Background

TradeArbed, Inc., Freemak Industries, Inc., and ARCELOR Trading U.S.A., Inc. d/b/a as Freemak Industries were incorporated and have their principal places of business in New York state.  Fed. Rec. 2:03-cv-03123-HGB-ALC Doc. 1.

1. Bills of Lading 6, 7, and 8.

On August 1, 2003 in Bourgas, Bulgaria, bill of lading number 6 was issued with reference number WBC38922. Jt. Tr. Ex. 62.  It covered 129 cold rolled coils with a net weight of 1,026,271MT to be discharged in New Orleans, Louisiana.  Id.  The bill of lading identified a number of coils with apparently minor damage to either the packing or straps, with 19 of the coils having white oxidation on the packaging.  Id.  The bill identified the vessel as the M/V MEDI TRADER, the shipper as Kremikovtzi Corp., and the consignee as TradeArbed.  Id.  The bill of lading was signed "'Terra Eco Shipping' as Agent for the Master of M/V 'MEDI TRADER.' Capt. Julio R. Javier, III."  Id.  On the same day, bill of lading number 7 was issued with reference number WBC38923.  Jt. Tr. Ex. 50.  It covered 241 cold rolled coils with a net weight of 1,971,763MT.  Id.  The bill of lading identified the same types of damage to the packaging of the coils, with 25 having white oxidation on the packages.  Id.  The bill was signed in the same manner as

24

bill 6 and listed the same parties. Id. Also on the same day, bill of lading number 8 was

issued with reference number WBC38924. Jt. Tr. Ex. 54. It covered 225 cold rolled

coils with a net weight of 1,981,700MT. Id. The bill of lading identified the same types

of damage to the packaging of the coils, with 18 coils having white oxidation the

packages. Id. The bill was signed in the same manner as bills 6 and 7 and listed the

same parties. Id.

### 2. Bills of Lading 35-42

On December 27, 2002 in Odessa, Ukraine bill of lading 35 was issued with

reference number WBC38883. Jt. Tr. Ex. 71. It covered 134 pieces of steel pipe with a

net weight of 140.914MT for discharge in Houston, Texas. Id. It was marked clean on

board and signed by the Master of the M/V MEDI TRADER, Capt. Julio R. Javier, III.

Id. The shipper was listed as Intergate AG, the carrier was Seafarers Shipping, Inc., and

the consignee was Fremak [sic] Industries, Inc. Id. On the same day, bill of lading

number 36 was issued with reference number WBC38884. Id. It covered 80 steel pipes

with a net weight of 111.77MT for discharge in Houston, Texas. Id. All other relevant

aspects of the bill were the same as in number 35. Id. Another bill of lading, number 37,

was issued with reference number WBC38885. Id. It covered 269 steel pipes with a net

weight of 679.324MT. Id. All other relevant aspects of the bill were the same as in

number 35. Id. Bill of lading number 38 was also issued that day, with reference number

WBC38886. Id. It covered 107 steel pipes with a net weight of 135.856MT. Id. All

other relevant aspects of the bill were the same as in number 35. Id. Bill of lading

number 39 was also issued on December 27, 2002, with reference number WBC38887.

Id. It covered 80 steel pipes with a net weight of 268.508MT. Id. All other relevant

aspects were the same as in bill number 35. Id. Next, bill of lading number 40 was

issued with reference number 38888. Id. It covered 53 steel pipes with a net weight of

89.354MT. Id. All other relevant aspects of this bill of lading were the same as in

number 35. Id. Bill of lading number 41 was the next issued and had reference number

WBC38889. Id. It covered 53 steel pipes with a net weight of 176.879MT. Id. All

other relevant aspects of the bill were the same as in number 35. Id. Finally, bill of

lading number 42 issued with reference number WBC38890. Id. It covered 40 steel

pipes with a net weight of 178.627MT. Id. All other relevant aspects of the bill were the

same as in number 35. Id.

### b.  Theories of Liability

For a discussion of COGSA and general maritime negligence, see II(B)(c) supra.

### c.  Claims for the Steel Pipes

Concerning bills of lading 35-42, Seafarers was not a party to a contract of

carriage for the steel pipes.  The private carriage agreement, evidenced by the booking

note, between Western Bulk and Freemak is the controlling contract of carriage. Jt. Tr.

Ex. 4  The fact that the bills of lading were signed by an agent of Seafarers with it listed

as the carrier is not dispositive as bills of lading which are also covered by a charter party

that are not negotiated do not form the applicable contract of carriage. See Associated

Metals & Minerals Corp. v. S/S JASEMINE, 983 F.2d 410, 413 (2nd Cir. 1993) (citing

Vanol USA, Inc. v. M/T CORONADO, 663 F.Supp. 79, 81 (S.D.N.Y. 1987).  Further,

the Court finds that it would have been unreasonable for Freemak to enter into a second

contract of carriage with Seafarers through the bills of lading when it had already

contracted with Western Bulk for the same. See Great American Ins. Co. v. M/V

HANDY LAKER, 2003 A.M.C. 116, 133-36 (S.D.N.Y. 1999) (citing Flat-Top Fuel Co. v. Martin, 1936 85 F.2d 39,41 (2nd Cir. 1936). Consequently, while there is a non-delegable duty of a ship owner to cargo under the COGSA scheme, such a duty in private contracts of carriage is absorbed by the charters, "for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charters." Great American, 2003 A.M.C. at 136; Jt. Tr. Ex. 4, pg. 3; Great American, 2003 A.M.C. 135-37. Consequently, the vessel interests, Seafarers and Victoria, have no liability in contract to Freemak.

Freemak may however recover in negligence if the vessel interests were in fact negligent. Unfortunately, resolving the issue of negligence is thwarted by the bifurcation of the issue of whether Western Bulk or Seafarers had the hands-on responsibility for the cargo stowage. As with the issue of Western Bulk's liability for negligence, if any, towards Cargill, the vessel interests' liability toward Freemak for negligence, if any, was effectively severed by virtue of the bifurcation, to be resolved at a later date.

Western Bulk is a COGSA carrier as to Freemak by agreement of the parties. Jt. Tr. Ex. 4, pg. 5. However, Western Bulk does not contest liability for the damage to the steel coils. See Rec. Doc. 85 at ¶ 2; Rec. Doc. 98, pg. 4. The Court, viewing the pre-load survey for the steel coils, along with the clean on board bills of lading, and the damage surveys, concludes that the steel pipes were loaded in an undamaged condition, and unloaded in a damaged condition caused by the negligence of Western Bulk in stowage of the pipes beneath rebar which crushed them during transit. Compare Jt. Tr. Ex. 19, 80 with Jt. Tr. Ex. 77, 78, 79, 85. Consequently, Western Bulk is liable to Freemak for

27

$256,814.22 plus interest.[6]  Jt. Tr. Ex. 77, pg. 13.  This does not include a "double charge" for trucking as Freemak's customer refused the shipment and Freemak was required to truck the pipes to segregate the damage, meaning that trucking was not as per the F.O.B. terms of the contract.  Jt. Tr. Ex. 96, pg. 77.  Therefore, it is **ORDERED** that Western Bulk is liable $256,814.22 to Freemak plus prejudgment interest.

### d.  Claims for the Cold Rolled Coils

The claims pertaining to bills of lading 6-8 are somewhat different.  The charter parties submitted between and Western Bulk and TradeArbed/Arcelo for hot rolled coils also include the claims for the shipments of cold rolled coils according to the testimony of George Bradford.  See Jt. Tr. Ex. 5-6, 96 pg. 29-30.[6]  Apparently, the charter parties to which the bills of lading refer as signed on November 11, 2002 were in fact signed on December 5, 2002  Id.; Jt. Tr. Ex. 50, 54, 62, 96, pg. 29-30 (noting it was the intention that these charter parties cover both the hot and cold rolled coils).  Consequently, as there exists a charter party between Western Bulk and TradeArbed/Arcelor, that charter party is the applicable contract of carriage as none of the bills of lading were negotiated.  Rec. Doc. 58 at 17; Great American supra; Associated Metals supra.  The charter parties incorporate COGSA as the applicable law; however, neither they nor the bills of lading evidence a fair opportunity to declare a higher value for the shipment so as to invoke the $500.00 per package limitation because mere incorporation of a USA clause paramount into the bills of lading through the charter party is insufficient notice.  See Royal Ins. Co.

---

6. Various documents relating to these claims are described as produced for Arcelor, e.g. the damage surveys.  However, the bills of lading identify TradeArbed as the consignee.  Yet, there are two charter parties, one for both TradeArbed and Arcelor between Western Bulk.  The testimony of George Bradford seems to indicate that these companies merged, with TradeArbed becoming Arcelor Trading U.S.A., Inc.  Jt. Tr. Ex. 94 pg. 12-18.

v. ACX Ruby, 1998 WL 524899 (S.D.N.Y. 1998); St. Paul Fire & Marine Ins. Co. v.

Thypin, 1999 WL 639718 (S.D.N.Y. 1999); Macsteel v. M/V IBN ABDOUN, 154

F.Supp. 2d 826 (S.D.N.Y 2001).   Western Bulk cites Royal Insurance v. Sealand-

Service, Inc., 50 F.3d 723 (9th Cir. Cal.1995), but the case is clearly distinguishable.   In

Royal Insurance, the relevant documents of carriage included a blank to allow the shipper

to enter a declared value and on the back, it expressly set forth the $500 limit in the

absence of a declared value.  No such notice appeared on the relevant documents here.

Similarly, in Cargill Ferrous International v. ARCTIC CONFIDENCE, 1994 WL 97787

(E.D.La. 1994), also cited by Western Bulk, the trial court found that the shipper's

representative was aware of the limitation, based on his actual testimony.

     Accordingly, COGSA, with the exception of the limit of recovery, applies to

these contracts of carriage.

     To determine whether the cargo was loaded in an undamaged condition, the Court

turns to the pre-load survey.  Jt. Tr. Ex. 22.  While it at first appears that a number of the

coils are heavily rusted, once reference is made to the marking scheme contained in the

report, it is easy to see that those coils marked as hot rolled coils are those that evidence

rust. Id. at 6 and pictures.  Those marked with crosses to denote that they were cold

rolled are apparently in good order.  Id. at 3 and pictures.  Accordingly, while the bills of

lading were claused to note some defects in packaging and the load survey also

demonstrates this, it is the Court's conclusion after viewing the photographs that any rust

on the coils themselves was on the hot rolled coils, rather than the blue and white crossed

materials or the brown striped material.  Consequently, TradeArbed/Arcelor has carried

its burden of proving the cargo was loaded in an undamaged condition.  Further, as to

bills of lading 7 and 8, TradeArbed/Arcelor has carried its burden of proof to demonstrate that the coils were unloaded in a damaged condition as they were rusted. See Jt. Tr. Ex. 59, 60, 86, 87, 82, 83. Further, the damages suffered were $574,542.83. Jt. Tr. Ex. 59. The Court finds this was a result of incompatible cargo being stowed together and that the depreciated value accepted for the coils was reasonable. As to bill of lading 6, rather than rust, these coils were primarily damaged by oil emulsification. See Jt. Tr. Ex. 68, 84, 85. This was a product of a combination of oil and water from the high humidity in the cargo holds. Consequently, the Court finds that this cargo was also damaged as a result of incompatible cargo being stowed together and that damages are $212,679.61 after mitigation of damages by TradeArbed/Arcelor through acceptance a reasonable depreciation. Jt. Tr. Ex. 68.

TradeArbed/Arcelor may also recover in negligence if the vessel interests were in fact negligent. Unfortunately, resolving the issue of negligence is thwarted by the bifurcation of the issue of whether Western Bulk or Seafarers had the hands-on responsibility for the cargo stowage. As with the issue of Western Bulk's liability for negligence, if any, towards Cargill, the vessel interests' liability toward TradeArbed/Arcelor for negligence, if any, was effectively severed by virtue of the bifurcation, to be resolved at a later date.

Accordingly, it is **ORDERED, AJUDGED, and DECREED** that Western Bulk is liable to TradeArbed/Arcelor[7] in the amount of $787,222.44 for damage to the cold rolled coils, plus prejudgment interest.

---

[7] As discussed supra in note 3, TradeArbed merged with Arcelor Trading U.S.A., Inc to become Arcelor Trading.

### IV.  Cross- and Third-Party Claims by Seafarers and Victoria

Seafarers and Victoria filed a cross-claim and third-party action against Western

Bulk on June 2, 2005.  Rec. Doc. 35, 36.  These claims cannot be resolved at this time

since the issue of the general maritime negligence of the parties has in effect been

bifurcated.

### Conclusion

Having considered the testimony and evidence adduced at trial, the record and the

law, the Court grants relief as above.  To re-cap:  (1) It is **ORDERED** that  the M/V

MEDI TRADER is liable in rem to Cargill for $264,452.67 plus prejudgment interest;

(2)  It is **ORDERED** that Western Bulk pay to TradeArbed/Arcelor[8] in the amount of

$787,222.44 for damage to the cold rolled coils, plus prejudgment interest; (3) It is

**ORDERED** that Western Bulk pay $256,814.22 to Freemak plus prejudgment interest.

New Orleans, Louisiana this _28_ day of March, 2007.

Helen G. Berrigan
United States District Judge for the Eastern
District of Louisiana

---

[8] As discussed supra in note 2, TradeArbed merged with Arcelor Trading U.S.A., Inc to become Arcelor
Trading.